VENTANA PARTNERS, LLC,
fka Montara Partners, LLC,
and Studio 1235, LLC,
an Oregon limited liability company,
*Plaintiffs-Appellants,*

*v.*

LANOUE DEVELOPMENT, LLC,
an Oregon limited liability company,
*Defendant,*

*and*

CHICAGO TITLE INSURANCE COMPANY
OF OREGON,
an Oregon corporation;
Harper Houf Peterson Righellis, Inc.,
an Oregon corporation;
Lodestar Surveying, Inc.,
an Oregon corporation,
fka G & L Land Surveying, Inc.,
an Oregon corporation;
Lawyers Title Insurance Corporation,
dba Land America Lawyers Title Insurance Corporation,
fka Oregon Title Insurance Company,
a Nebraska corporation;
Stoel Rives, LLP,
an Oregon Limited Liability Partnership;
Howard M. Feuerstein, an individual,
and Rene G. Gonzalez, an individual,
*Defendants-Respondents.*

Multnomah County Circuit Court
080507701; A148839

340 P3d 107

Gordon T. Carey, Jr., argued the cause and filed the briefs for appellants.

Jonathan M. Radmacher argued the cause for respondents Chicago Title Insurance Company of Oregon and Lawyers Title Insurance Corporation. With him on the brief was McEwen Gisvold LLP.

Michael T. Garone argued the cause for respondent Harper Houf Peterson Righellis, Inc. With him on the brief were William J. Ohle and Schwabe, Williamson & Wyatt, P. C.

Graham M. Sweitzer argued the cause for respondents Stoel Rives, LLP, Howard M. Feuerstein, and Rene G. Gonzalez. With him on the brief were Stephen C. Voorhees and Kilmer, Voorhees & Laurick, P. C.

No appearance for respondents LaNoue Development, LLC, and Lodestar Surveying, Inc.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Wollheim, Senior Judge.*

DUNCAN, P. J.

---

* Haselton, C. J., *vice* Schuman, S. J.

## DUNCAN, P. J.

Plaintiffs purchased a piece of real property, which we refer to as Lot 1, from LaNoue Development, LLC (LaNoue),[1] intending to build condominiums on it and sell them.[2] The Oregon Real Estate Agency (OREA) and Multnomah County surveyor delayed plaintiffs' condominium sales by withholding approval of their certificate of condominium, and, ultimately, plaintiffs' project failed. Plaintiffs contended that problems with their title to Lot 1 caused the failure of the project, and they sought to recover their losses from defendants, who are surveyors, title companies, and attorneys involved in the creation and sale of Lot 1. Plaintiffs originally asserted claims against LaNoue as well; however, plaintiffs and LaNoue settled and LaNoue assigned its claims against defendants to plaintiffs. Plaintiffs then asserted those assigned claims as well as their own direct claims against defendants. The trial court granted all defendants' motions for summary judgment on all of plaintiffs' claims and entered a general judgment of dismissal. Plaintiffs appeal. For the reasons explained below, we affirm in part, reverse in part, and remand.

## I. FACTS

On appeal of a grant of summary judgment, we review the facts in the light most favorable to the nonmoving party to determine whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). We set out the facts in accordance with that standard.

In 1998, LaNoue retained defendant Howard Feuerstein, an attorney at defendant Stoel Rives, LLP, to prepare the governing documents for a planned community

---

[1] Throughout this opinion, we refer to both LaNoue Development, LLC, and its principal, Mark LaNoue, as LaNoue.

[2] At the time of the purchase, plaintiff Ventana Partners, LLC, (Ventana) was known as Montara Partners, LLC. Plaintiff Studio 1235, LLC, purchased Lot 1 and, on the same day, conveyed it to Montara Partners. Studio 1235 subsequently distributed its assets to Ventana, and Ventana and Studio 1235 brought this action on behalf of both purchasing parties. Like the trial court and the parties, we do not distinguish between the two plaintiffs.

in Portland known as Montara Estates.[3] Feuerstein prepared the Declaration of Protective Covenants, Conditions, Restrictions and Easements for Montara (declaration), which identified LaNoue as the declarant. *See* ORS 94.550(9) (defining "declarant" as "any person who creates a planned community under ORS 94.550 to 94.785").

LaNoue intended to develop Montara in three phases. The declaration identified "common areas" in all three phases of the development and provided that the townhouse lot owners would have easements in the common areas. It also provided that, after certain conditions were met, LaNoue would transfer ownership of the common areas to the homeowners association for the community, the Montara Owners Association (MOA). The declaration also contained two provisions relating to the MOA's ability to convey the common areas. Section 3.4(c) of the declaration provided:

> "The Association shall not by act or omission seek to abandon, partition, subdivide, encumber, sell or transfer the Common Areas owned directly or indirectly by the Association for the benefit of the Lots unless the holders of at least eighty percent (80%) of the Class A Association voting rights [(the lot owners)] and the [declarant] have given their prior written approval, and the City of Portland has given its written approval."

Section 6.5(h) provided:

> "Except as otherwise provided in Section 3.4(c) above, the Association may sell, transfer or encumber all or any portion of the Common Area to a person, firm or entity, whether public or private, and dedicate or transfer all or any portion of the Common Area to any public agency, authority, or utility for public purposes."

In 1999, defendants Harper Houf Peterson Righellis, Inc., (Harper Houf) and Lodestar Surveying, Inc., civil engineering firms, prepared the plat for Montara. The plat provided that the common areas would be "commonly owned and maintained" by the lot owners.

---

[3] The plat identified the planned community as Hartford Woods, but other documents identified it as Montara Estates. Throughout this opinion, we refer to the community as Montara.

The plat and declaration were recorded, and LaNoue began building and selling townhouses in Montara. Defendant Lawyers Title Insurance Corporation was the escrow company and LaNoue's title insurer for the townhouse sales. Before the sales began, LaNoue signed 35 blank deeds, and Lawyers Title filled in the required information and appended the legal description of the property when each townhouse sold. The legal description that Lawyers Title appended to each deed stated the specific townhouse lot number

> *"together with an undivided interest in Tracts 'A' through 'I' and Tracts 'N' through 'AA'* [(the common areas)], according to the duly filed plat of [Montara], in the City of Portland * * *."

(Emphasis added.) After the sale of each townhouse, Lawyers Title recorded the deed.

Because the three documents described above gave rise to the dispute underlying this case, we reiterate their relevant provisions: (1) The declaration provided that each townhouse owner would have an easement in the common areas and that LaNoue would eventually turn over the common areas to the MOA. By contrast, (2) the plat provided that Montara's common areas would be "commonly owned" by the townhouse owners, and (3) the deeds granted each townhouse owner "an undivided interest" in the common areas.

By 2002, LaNoue had built and sold 35 townhouses in the first and third phases of Montara. LaNoue had originally planned to build additional townhouses in phase two; however, due to market conditions, he decided that it would be better to build condominiums. That change of plan required both amending the declaration and removing from the plat the land designated for phase two, which included some of the common areas designated on the plat. The land designated for phase two of Montara subsequently became known as Lot 1.

In June 2002, LaNoue submitted to the City of Portland an application to build condominiums on Lot 1. It also sent a letter to the townhouse owners asking them to approve a modification of the documents governing Montara

to allow the change of plan. In response, the townhouse owners retained an attorney to fight the permit application and object to the condominium plan. Counsel for the townhouse owners contended that, because the land on which LaNoue wanted to build condominiums included some of the areas designated as common areas on the plat, all of the townhouse owners had to consent to the change of plan.[4]

LaNoue engaged Feuerstein to negotiate with the townhouse owners and redraft the Montara documents to allow condominiums to be built. Feuerstein advised LaNoue that, pursuant to a provision of the Oregon Planned Community Act (OPCA), ORS 94.550 to 94.783, the MOA could transfer common areas with the consent of 80 percent of the townhouse owners. *See* ORS 94.665(1) (set out and discussed below, 267 Or App at 26).

Feuerstein provided LaNoue with a draft of an amendment to the declaration and a consent form for LaNoue to distribute to the townhouse owners. The amendment to the declaration defined the former phase two property—Lot 1— as "the condominium property" and provided, in part:

> "The Condominium Property is hereby withdrawn from Montara and shall no longer be subject to the Declaration or any of the provisions thereof. Association hereby conveys any right, title or interest the Association may have in the former Common Areas within the Condominium Property to Declarant."

The amendment to the declaration also provided that, after the amendment was approved and recorded, LaNoue would convey new common areas—designated tracts A, B, C, and D—to the MOA.

After extended negotiations with the townhouse owners, during which LaNoue was represented by counsel not involved in this case, counsel for the townhouse owners began sending completed consent forms to LaNoue and to Feuerstein. LaNoue forwarded those consents to the City of Portland's Office of Planning and Development, which was waiting for 80 percent of the townhouse owners to consent before approving LaNoue's building application.

---

[4] The townhouse owners initially did not rely on the language in the deeds.

By December 2003, the city had concluded that LaNoue had received consent from 80 percent of the town-house owners. It held a hearing on LaNoue's building application, at which LaNoue was represented by Harper Houf, and approved the application in a hearing-officer decision. In February 2003, LaNoue, acting on behalf of the MOA, of which he retained control at that point, signed the amendment to the declaration. The amendment to the declaration was recorded in October 2003 without a legal description of the property and then rerecorded in October 2004 with a legal description.

Harper Houf began replatting Montara in early 2004. After the replat was complete, LaNoue submitted it to the Multnomah County surveyor, who questioned whether the language in the townhouse owners' deeds—which, as noted above, conveyed "an undivided interest" in the common areas to each owner—created a problem with title to Lot 1. Before the county surveyor would approve the replat, LaNoue was required to submit a preliminary title report showing clear title to Lot 1. Lawyers Title was to provide the preliminary title report.

Feuerstein and defendant Rene Gonzalez, another attorney at Stoel Rives, informed the county surveyor and Lawyers Title that, under both the OPCA and the declaration, the MOA could transfer the common areas after receiving consent from 80 percent of the townhouse owners notwithstanding the townhouse owners' deeded "undivided interest" in the common areas. Then Lawyers Title prepared a preliminary title report that did not mention the deeds, and, based on that report, the county surveyor approved the replat in October 2004. LaNoue recorded the replat in February 2005.

In May 2004, LaNoue and plaintiffs had entered into an agreement under which plaintiffs would purchase Lot 1. On April 1, 2005, LaNoue and plaintiffs entered into the final exchange agreement in which LaNoue agreed to convey Lot 1 to plaintiffs. The transaction closed through defendant Chicago Title Insurance Company of Oregon on April 27, 2005. Chicago Title insured that plaintiffs' title was free of encumbrances except those set forth in an

attachment, which did not specifically include the town-house owners' deeded interests. Although the amendment to the declaration provided that LaNoue would transfer tracts A, B, C, and D to the MOA, LaNoue instead transferred those common areas to plaintiffs along with Lot 1.

In June 2006, the MOA notified plaintiffs that it disputed plaintiffs' ownership of Lot 1. That was the first time that plaintiffs learned of the townhouse owners' deeded interests. In September 2006, the MOA filed claims against plaintiffs in Multnomah County Circuit Court.[5] The MOA sought to quiet title to the common areas on both the plat and the replat. It alleged, *inter alia*, that "[t]he purported [amendment to the declaration] recited that declarant was legal title holder to the Common Areas within Montara, despite the declarant having conveyed undivided interests in the common areas to the purchasers of lots in phases one and three. There was never a reconveyance back to the declarant of the interests in the common areas."

After they received notice of the MOA's claims, plaintiffs consulted with counsel and concluded that either the title problems would be resolved or Chicago Title would defend their title to Lot 1. Plaintiffs instructed their counsel to tender the MOA action to Chicago Title for defense, but the record does not indicate that counsel did so until January 2007.

By February 2007, plaintiffs had substantially completed the first condominium building on Lot 1. Before plaintiffs could sell condominiums, the OREA had to approve plaintiffs' declaration of condominium so that they could record it in Multnomah County. The OREA declined to approve the declaration of condominium because the MOA's claims remained pending against plaintiffs. Because Chicago Title had not responded to plaintiffs' tender of defense of the action, plaintiffs' counsel negotiated a settlement with the MOA, which was signed in March 2007. Under that settlement, plaintiffs agreed to quitclaim their interest in Tracts

---

[5] The MOA joined plaintiffs as defendants in an action that was already pending against LaNoue for construction defects. The claims against LaNoue resulted in our opinion in *Montara Owners Assn. v. La Noue Development, LLC*, 259 Or App 657, 317 P3d 257 (2013), *rev allowed*, 355 Or 567 (2014).

A, B, C, and D to the MOA, and the MOA agreed to obtain a quitclaim deed from each of the townhouse owners and deed its resulting interest in Lot 1 to plaintiffs.

By September 2007, the MOA had not obtained quit-claim deeds from all of the townhouse owners. Nevertheless, at the urging of counsel for Chicago Title, who promised that Chicago Title would insure title for condominium purchasers, the county permitted plaintiffs to complete and record the declaration of condominium. By that time, however, plaintiffs were in default on their borrowing obligations and, consequently, they suffered the losses alleged in the complaint.

## II. PROCEDURAL HISTORY

Plaintiffs then filed this action, alleging that they had not received "good title" to Lot 1 and that uncertainty about the title to Lot 1 delayed their sale of condominiums and ultimately caused their project to fail. Plaintiffs alleged direct breach of contract, negligence, and other claims against LaNoue, Chicago Title, Harper Houf, Lodestar, and Lawyers Title.

While the litigation was pending, LaNoue settled with plaintiffs. LaNoue assigned to plaintiffs all of its claims arising from the transaction, agreed to a stipulated judgment against it for $5.8 million, and promised that its principal, Mark LaNoue, would cooperate with plaintiffs during litigation. For their part, plaintiffs promised not to enforce the stipulated judgment against LaNoue. Plaintiffs then continued litigating their direct claims as well as the additional indemnity, breach of contract, and negligence claims assigned by LaNoue against Chicago Title, Harper Houf, Lodestar, Lawyers Title, Stoel Rives, Gonzalez, and Feuerstein.[6]

---

[6] In the operative Eighth Amended Complaint, plaintiffs alleged various claims against LaNoue and the following:

- Direct claim against Harper Houf and Lodestar: Negligence
- Direct claims against Chicago Title: Breach of duty to defend, breach of policy, negligent review and abstraction of title, breach of obligation of good faith and fair dealing, interference with contractual relations and prospective advantage
- Direct claim against Lawyers Title: Negligence

On defendants' motions for summary judgment, the trial court ruled that LaNoue had complied with the statutory procedure and the consistently written procedure in the declaration allowing the MOA to transfer the common areas in Lot 1 to LaNoue and that such compliance superseded the townhouse owners' deeded interests in the common areas. Accordingly, it concluded that plaintiffs had not received defective title to Lot 1. The court also ruled that plaintiffs had received marketable title to Lot 1. The court agreed with defendants that its conclusion defeated all of plaintiffs' claims except the third claim against Chicago Title, for breach of duty to defend. With respect to that claim, the court ruled that plaintiffs had not timely notified Chicago Title of the MOA claims and that failure prejudiced Chicago Title. Accordingly, it granted summary judgment to all defendants on all claims.[7] Plaintiffs appeal the resulting judgment.

## III. ARGUMENTS ON APPEAL

Plaintiffs do not challenge the trial court's conclusion that, if plaintiffs received title that was not defective and was marketable, defendants were entitled to summary judgment on all claims apart from the duty-to-defend claim against Chicago Title. Rather, plaintiffs assign error to the trial court's conclusions about the state of title to Lot 1. They contend that the court erred in concluding that their title to Lot 1 was not defective, arguing that compliance with ORS 94.665(1), the OPCA's procedure for transferring common

---

- Assigned claims against Harper Houf and Lodestar: Indemnity, breach of contract, and negligence
- Assigned claims against Chicago Title: Indemnity and negligence
- Assigned claims against Lawyers Title: Indemnity, breach of contract, and negligence
- Assigned claims against Stoel Rives, Gonzalez, and Feuerstein: Malpractice and breach of contract

[7] Lodestar did not appear in the trial court, and the court entered an order of default against it. After granting the other defendants' motions for summary judgment, the trial court granted Harper Houf's motion to set aside the order of default with the proviso that "the default shall be reinstated should the cause of action be remanded to the trial court by an appellate court." Then the court dismissed plaintiffs' claims against Lodestar with prejudice "for the same reasons Defendant Harper Houf Peterson Righellis, Inc.'s Motion for Summary Judgment was granted." Plaintiff does not assign error to that ruling, and Lodestar did not appear on appeal.

areas, could not divest the townhouse owners of their deeded interests in the common areas in Lot 1. Alternatively, they argue that they have raised genuine issues of material fact as to whether LaNoue complied with the OPCA.

Plaintiffs also assign error to the trial court's conclusion that they received marketable title from LaNoue. In plaintiffs' view, a reasonable buyer in their position who knew of the townhouse owners' deeded interests would not have accepted title because the legal question whether the MOA's transfer of the common areas divested the townhouse owners of their deeded interests was unsettled. Finally, plaintiffs argue that the trial court erred in granting summary judgment to Chicago Title on the duty-to-defend claim because, at a minimum, there is a question of fact as to whether they timely tendered defense of the MOA action to Chicago Title.

As explained below, we conclude that the title that plaintiffs received to Lot 1 was not defective because ORS 94.665(1) allowed the MOA to transfer the common areas to LaNoue after receiving consent from 80% of the townhouse owners. To the extent that plaintiffs challenge LaNoue's compliance with the statutory procedure, we reject or decline to consider those challenges. Next we conclude that plaintiffs' title to Lot 1 was marketable when it was transferred. We reject plaintiffs' contention that marketability of title is a question of fact, and we conclude that the operation of ORS 94.665(1) was not a "doubtful and unsettled legal question" that would cause a prudent buyer to reject the title. Finally, we agree with plaintiffs that the trial court erred in granting summary judgment to Chicago Title on the duty-to-defend claim, because the court's ruling depended on an incorrect understanding of when plaintiffs settled the MOA claim. Accordingly, we reverse and remand on the duty-to-defend claim and otherwise affirm.

## IV. ANALYSIS

A. *Plaintiffs Did Not Receive Defective Title*

1. *Operation of ORS 94.665(1)*

We begin with plaintiffs' contention that the trial court erred in concluding that LaNoue transferred title to Lot 1 to plaintiffs free of defects, which depends on the

operation of ORS 94.665(1), specifically, whether compliance with ORS 94.665(1) superseded the townhouse lot owners' deeded interests in the common areas. We review questions of statutory construction for errors of law, first examining the text and context of the statute and any useful legislative history to determine the legislature's intent. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin by setting out the relevant statutes.

It is undisputed that Montara is a planned community subject to the OPCA. ORS 94.550(19) (defining "planned community"). The OPCA is intended to help developers, their legal counsel, homeowners, and homeowners associations avoid problems caused by excessive voting requirements in documents governing planned communities and to avoid a "lack of disclosure of significant differences this pattern of ownership imposes on the homeowner and the restrictions on choice that must be accepted" by homeowners in planned communities. ORS 94.560(3), (7).

Under the OPCA, a homeowners association, as an entity separate from the individual homeowners, has the ability to transfer common property. ORS 94.665(1), the provision on which LaNoue relied to clear title to Lot 1, provides as follows:

> "Except as otherwise provided in the declaration, a homeowners association may sell, transfer, convey or subject to a security interest any portion of the common property if 80 percent or more of the votes in the homeowners association, including 80 percent of the votes of lots not owned by a declarant at the time of the vote, are cast in favor of the action."

The legislature contemplated that a homeowners association would exercise its ability to sell, transfer, convey, or encumber common property through an instrument. *See* ORS 94.665(6) (providing requirements for "[a]n instrument that sells, transfers, conveys or encumbers common property pursuant to subsection (1) of this section").

ORS 94.550(7) defines "common property" as

> "any real property or interest in real property within a planned community which is owned, held or leased by the homeowners association or owned as tenants in common by

the lot owners, or designated in the declaration or the plat for transfer to the association."[8]

Thus, ORS 94.665(1) provides that a homeowners association may "sell, transfer, [or] convey" an interest in "common property" upon a vote of 80 percent of the lot owners other than the declarant. ORS 94.665(1). Before the trial court and for purposes of this appeal, it is undisputed that the common areas met the definition of "common property" in ORS 94.550(7) because they were owned as tenants in common by the lot owners.[9] Accordingly, the trial court reasoned,

---

[8] In 2001, the legislature amended the definition of "common property":

"'Common property' means any real property or interest in real property within a planned community which is owned, **held** or leased by the homeowners association or owned as tenants in common by the lot owners, or designated in the declaration for transfer to the association. [*'Common property' does not include any lot designated on the plat or in the declaration of a planned community for ownership by a person other than the homeowners association.*]"

Or Laws 2001, ch 756, § 5 (inserted material in bold, deleted material in bracketed italics). In a footnote in their brief, plaintiffs note that the trial court applied the amended version and state that "[a]n earlier version may have controlled." They do not explain why the earlier version may apply or discuss any consequences that might flow from that determination. All of their arguments are made under the amended version of the statute. Accordingly, we, like the trial court and the parties, apply the amended version.

In 2007, the legislature made another small amendment to the definition of "common property." Common property now includes property "designated in the declaration **or the plat** for transfer to the association." Or Laws 2007, ch 410, § 1 (inserted material in bold). That change does not affect our analysis. Accordingly, unless otherwise noted, we refer to the current version of the provision throughout this opinion.

[9] In their reply brief, plaintiffs argue, for the first time, that the townhouse owners did not hold the common areas as tenants in common because their interests were not created by a "'single conveyance or devise to two or more persons.'" *Hammond v. Hammond*, 246 Or App 775, 781, 268 P3d 691 (2011) (quoting *Stevens v. Theurer*, 213 Or App 49, 53, 159 P3d 1224 (2007)) (some internal quotation marks omitted). Below, defendants asserted that the townhouse owners owned the common areas as tenants in common. Plaintiffs responded that, notwithstanding its applicability, ORS 94.665 could not extinguish the townhouse owners' deeded interests in the common areas. They did not challenge the applicability of ORS 94.665(1) or ORS 94.550(7) to the situation. In their opening brief on appeal, plaintiffs reasserted the arguments that they raised below. Accordingly, we do not address plaintiffs' reply argument both because it was not preserved, *see State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (explaining requirements of preservation); *State v. Smith*, 184 Or App 118, 121-23, 55 P3d 553 (2002) (statutory construction argument was preserved because although, at trial, the defendant had failed to raise the particular statute on which he relied on appeal, he had raised the same issue that he argued on appeal), and because it was not raised in their opening brief, *see Ailes v. Portland Meadows, Inc.*, 312 Or

the MOA was able to convey the townhouse owners' interest in the common areas upon consent from 80 percent of the townhouse owners.[10] The MOA did so through an instrument, namely, the amendment to the declaration. Thus, the trial court concluded, the amendment to the declaration properly conveyed the interest of all of the townhouse owners in the common areas, notwithstanding the deeds.

Plaintiffs disagree with that view. However, they do not advance any alternative understanding of the text of ORS 94.665(1) or ORS 94.550(7). Rather, they argue that, for a number of reasons, the OPCA cannot operate as it appears to. As the above explanation of the trial court's reasoning demonstrates, the trial court's construction of ORS 94.665(1) and ORS 94.550(7) accords with the plain meaning of those provisions. None of plaintiffs' arguments convinces us that those provisions do not mean what they say.

Plaintiffs first argue that the MOA could not transfer the townhouse owners' interests in the common areas because it did not own those interests. However, the statute plainly allows a homeowners association to transfer some interests to which it does not hold title. Plaintiffs offer no alternative reading of the statutory text. The legislature defined "common property" to include interests in property "owned as tenants in common by the lot owners, or designated in the declaration for transfer to the association," ORS 94.550(7) (2005), and the text allows homeowners associations to transfer "common property" upon a vote of 80 percent of the lot owners. Thus, a homeowners association may transfer certain interests in property to which it does not hold title. To accept plaintiffs' argument to the contrary

---

376, 380-81, 823 P2d 956 (1991) (citing ORAP 5.45 and explaining that appellate courts do not consider rulings assigned as error that are raised for the first time in a reply brief); *Hayes Oyster Co. v. Dulcich*, 170 Or App 219, 237 n 20, 12 P3d 507 (2000) ("Hayes advances a different basis in its reply brief as to why the trial court erred. Hayes' new argument comes too late.").

[10] ORS 94.665(1) requires that "80 percent or more of the votes in the homeowners association" be "cast in favor of the action." Here, LaNoue obtained written consent forms from the townhouse owners; no vote was cast. Plaintiffs have not challenged LaNoue's method of obtaining consent from the townhouse owners. *See* ORS 94.660 (prescribing methods of voting or consenting under the OPCA). Accordingly we refer to consent of the townhouse owners and a vote of the townhouse owners interchangeably.

would require us to "omit what has been inserted," which we may not do. ORS 174.010.

Next, plaintiffs note that ORS 94.665(1) allows a homeowners association to sell, transfer, or convey common property "[e]xcept as otherwise provided in the declaration." In plaintiffs' view, "the Montara declaration, § 3.4(c), restricted the MOA's conveyance authority to common areas it 'owned directly or indirectly.'" We disagree.

As noted above, section 3.4(c) of the declaration provides:

> "The Association shall not by act or omission seek to abandon, partition, subdivide, encumber, sell or transfer the Common Areas owned directly or indirectly by the Association for the benefit of the Lots unless the holders of at least eighty percent (80%) of the Class A Association voting rights [(the lot owners)] and the [declarant], if any, have given their prior written approval, and the City of Portland has given its written approval."

That provision imposes a procedure that the MOA must follow in order to convey property "owned directly or indirectly" by the MOA. The MOA followed that procedure by obtaining consent from 80 percent of the townhouse owners and a letter from the City of Portland noting its approval of the amendment to the declaration.

However, even if plaintiffs are correct in their assertion that the common areas at issue here were not "owned directly or indirectly" by the MOA—a question that we do not decide—the declaration still allows the MOA to convey common areas as permitted by ORS 94.665(1). That is so because section 6.5(h) of the declaration provides, "Except as otherwise provided in Section 3.4(c) (block quoted above), the Association may sell, transfer or encumber all or any portion of the Common Area to a person, firm or entity, whether public or private * * *." Thus, regardless of whether the common areas at issue were owned "directly or indirectly" by the MOA, ORS 94.665(1) permitted the conveyance and the declaration did not provide otherwise.

Next, plaintiffs contend that, even aside from the townhouse owners' deeded interests in the common areas,

the MOA could not convey the common areas to LaNoue because, although the common areas were designated in the declaration for transfer to the MOA, LaNoue had not yet transferred the common areas to the MOA. Like plaintiffs' first argument, that argument fails because it contravenes the statutory text. "Common property" includes property "designated in the declaration for transfer to the association." ORS 94.550(7) (2005). Accordingly, ORS 94.665(1) allowed the MOA to transfer common property, even if it had not yet been transferred from the declarant to the association.

Finally, plaintiffs contend that the amendment to the declaration was ineffective to convey title to Lot 1 to LaNoue because "the recorded [amendment to the declaration] was not fully executed" because the signature line for the City of Portland was not filled in. However, a signature from the city is not required on an instrument conveying title to common property under ORS 94.665(1). *See* ORS 94.665(6) (formal requirements for an instrument conveying common property do not include signature from the city). And, as noted above, the city gave the approval required by the declaration.

Thus, the trial court correctly construed ORS 94.665(1) in accordance with the plain meaning of its text. That provision allowed the MOA to convey the townhouse owners' interests in the common areas in Lot 1 to LaNoue after receiving consent from 80 percent of the townhouse owners.

### 2. *LaNoue's Compliance with ORS 94.665(1)*

Plaintiffs argue that, even if ORS 94.665(1) allowed the MOA to convey the townhouse owners' interests in the common areas in Lot 1, the trial court still erred in granting summary judgment to defendants because there is a question of fact as to whether "80 percent or more of the votes in the homeowners association, including 80 percent of the votes of lots not owned by [the] declarant at the time of the vote, [were] cast in favor of the [conveyance of the common areas]." ORS 94.665(1).

Plaintiffs raise three arguments in support of that position. We begin by noting that plaintiffs' arguments are

actually legal arguments in support of plaintiffs' view that, under the facts presented here, the requirements of ORS 94.665(1) were not satisfied before the MOA conveyed the common areas to LaNoue. That is, these arguments do not depend on disputed evidence that must be evaluated by a trier of fact, *see* ORCP 47 C ("No genuine issue as to a material fact exists if * * * no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."); rather, they depend on the operation of ORS 94.665(1), which, as noted above, is a matter of law.

First, plaintiffs note that LaNoue sought consent from the townhouse owners to two different condominium plans that he submitted to the city at different times. He obtained consent to the first plan from a number of townhouse owners, but some townhouse owners withdrew their consent when they learned the details of the plan. LaNoue then revised the plan to respond to the townhouse owners' concerns, and the objecting townhouse owners eventually completed new forms indicating their consent to the revised plan. The townhouse owners who had not withdrawn their consent, however, never completed new forms consenting to the revised plan. Plaintiffs argue that, because 80 percent of the townhouse owners did not agree to a single condominium plan, the conveyance of the common areas was invalid.

Through the consent forms, the townhouse owners consented to several changes to the governing documents of Montara. However, only one is relevant to whether 80 percent of the townhouse owners consented to the conveyance of the common areas. All the consent forms provided, "Lot Owner consents to the [amendment to the declaration]." As set out above, the amendment to the declaration provided, "[The MOA] hereby conveys any right, title or interest the Association may have in the former Common Areas within the Condominium Property to Declarant." Thus, whether they consented to the first or the second condominium plan, all of the townhouse owners who submitted consent forms consented to the conveyance.

Plaintiffs next argue that the consents were conditioned on the recording of a restrictive covenant. Plaintiffs

contend that they have made a search of the relevant records and have not found any restrictive covenant. Accordingly, plaintiffs apparently contend, the consents were invalid. However, even to the extent that there might be a factual dispute about whether the restrictive covenant was separate from the amendment to the declaration, that fact is "material" only if we accept plaintiffs' implicit legal argument that, for purposes of ORS 94.665(1), a lot owner's vote in favor of the conveyance is invalid if the form states that it is conditioned upon a subsequent event that does not occur. *See Zygar v. Johnson*, 169 Or App 638, 646-47, 10 P3d 326 (2000), *rev den*, 331 Or 584 (2001) ("A material fact is one that, under applicable law, might affect the outcome of a case.").

Plaintiffs' legal argument implicates the meaning of a "vote" of the lot owners under ORS 94.665(1) and ORS 94.660, which plaintiffs do not purport to challenge, as well as the legal effect of the language of the consent forms, which plaintiffs do not discuss. In light of that lack of development, we decline to address plaintiffs' argument. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function" "to make or develop a party's argument when that party has not endeavored to do so itself.").

Similarly, because plaintiffs have failed to develop their third argument below or on appeal, we decline to address it. In that argument, plaintiffs contend that they raised an issue of material fact by submitting an averment by plaintiffs' counsel that at least eight of the townhouse owners sold their townhouses after consenting to the amendment to the declaration and before LaNoue "signed and recorded" the amendment. That presents a legal argument about the operation of ORS 94.665(1), not a factual dispute for the trier of fact. Plaintiffs did not explain below, and do not explain on appeal, why it is significant to the operation of ORS 94.665(1) that some townhouse owners sold their townhouses after giving consent but before LaNoue signed or recorded the amendment to the declaration.

The MOA successfully conveyed the common areas in Lot 1 to LaNoue by operation of ORS 94.665(1). Consequently, plaintiffs did not receive defective title to Lot 1.

## B.  *Marketable Title*

Having concluded that plaintiffs did not receive defective title to Lot 1, we turn to their argument that they received unmarketable title to Lot 1 because, at the time of the conveyance from LaNoue, the title was not "free from reasonable doubt, factually and legally." *Security Savings & Trust Co. v. Evans*, 144 Or 15, 22-23, 21 P2d 782 (1933) (describing standard for marketable title).

### 1.  *Marketability is a Question of Law*

Because it affects our standard of review, we next address plaintiffs' contention that marketability of title is a question of fact. Plaintiffs note that, in *Wollenberg v. Rose*, 45 Or 615, 621, 78 P 751 (1904), the Supreme Court drew a distinction between marketability as a legal issue and as a factual issue. In plaintiffs' view, *Wollenberg* establishes that marketability is a question of fact whenever it depends on facts outside the deed record, and that is the case here. Plaintiffs apparently contend that, in such a case, the role of the trier of fact is not only to find the underlying historical facts, but also to make the ultimate determination of marketability. Accordingly, plaintiffs argue that they raised a question of fact as to the marketability of title to Lot 1 by noting facts outside the deed record on which they intended to rely and informing the trial court that they would present expert testimony to the effect that title was not marketable. *See* OEC 702 (permitting a party to present expert testimony where specialized knowledge will "assist the trier of fact to understand the evidence or to determine a fact in issue").

In *Wollenberg*, the Supreme Court addressed whether title was marketable, such that a purchaser had to accept a tender of it, when grantors of the vendor "were seeking to set aside their conveyances to [the vendor] for fraud perpetrated

by him in procuring them."[11] 45 Or at 619. The court noted that the fraud litigation was pending and that "there is some evidence that it is being prosecuted in good faith, there being none to the contrary." *Id.* at 620. In the fraud cases, the grantors had "stated good causes for relief, which tend palpably to discredit the title [that was tendered]." *Id.*

After explaining the standard for marketable title, the court stated:

> "If the title depends on the [deed] record, and all the muni-ments are in evidence, so that the defects may appear from an inspection, it is then purely a question of law for the court to determine and settle by construction; but, if it depends upon matters of fact to be established by parol, then the cause must be made very clear by the vendor to warrant a court in ordering specific performance."

*Id.* at 621. The court noted that, under the circumstances before it, "[t]he question to be determined as to the fraud * * * is one of fact," but nevertheless concluded that, under the circumstances, the existence of the lawsuits—regardless of the outcome—rendered the title unmarketable. *Id.* Accordingly, the court reversed the trial court's judgment in favor of the plaintiff. *Id.* at 623.

Contrary to plaintiffs' argument, the court's hold-ing in *Wollenberg* demonstrates that the ultimate determi-nation of marketability is always a matter of law. The part of the opinion on which plaintiffs rely, block quoted above, does not show that the ultimate question of marketability is ever decided by the trier of fact; rather, it explains that, once the validity of the title has been called into question, the burden of proving facts outside the deed record on which the marketability of title rests is on the vendor. 45 Or at 621 ("[I]f [marketability of title] depends upon matters of fact to be established by parol, then the cause must be made very

---

[11] The plaintiff was the administrator of the partnership estate of S. Marks & Co., with which the purchaser had originally contracted. Both partners had subsequently died, and ownership of the property had gone to their heirs. 45 Or at 618-19. One heir, Hermann Marks, had obtained deeds from the other heirs. He tendered a deed to the purchaser, which the purchaser refused on the ground that the other heirs were seeking to set aside their conveyances to Hermann Marks, alleging fraud. *Id.* at 619. For the sake of simplicity, we refer to Hermann Marks as the vendor.

clear *by the vendor* to warrant a court in ordering specific performance." (Emphasis added.)).

In *Wollenberg*, the court described what the evidence showed about the vendor's title—that lawsuits stating "good causes for relief, which tend palpably to discredit the title," *id.* at 620, were pending—and held that, as a matter of law, those lawsuits rendered the title unmarketable. *Id.*; *see also Evans*, 144 Or at 23-24 (without expressly stating standard of review, assessing trial court's ruling on marketability of title for legal error); *Cameron v. Benson*, 57 Or App 169, 173, 643 P2d 1360 (1982), *rev'd in part on other grounds*, 295 Or 98, 664 P2d 412 (1983) (same). The one additional Oregon case that plaintiffs cite in support of their argument that marketability of title is a question of fact is not to the contrary. *See Albertson and Albertson*, 90 Or App 559, 562 n 3, 752 P2d 1287 (1988) (in a dissolution case, the parties agreed that the marketability of a piece of property—that is, the ease with which it could be marketed and sold, not the marketability of its title—was adversely affected by the fact that the property was in a flood plain).

Because marketability of title is, ultimately, a question of law, it was appropriate for resolution on a motion for summary judgment, and plaintiffs were not entitled to present expert testimony that title was unmarketable. Although plaintiffs present facts from outside the deed record on which they contend that marketability turns, they do not raise any disputed factual issue that had to be resolved by a trier of fact before the trial court could properly decide, as a matter of law, whether title was marketable. Accordingly, we review the trial court's conclusion that plaintiffs received marketable title for errors of law. *See Bunnell v. Dalton Construction, Inc.*, 210 Or App 138, 142, 149 P3d 1240 (2006), *rev den*, 344 Or 558 (2008) (after a grant of summary judgment, we review legal issues for errors of law).

2.  *Plaintiffs Received Marketable Title*

Plaintiffs argue that they did not receive marketable title to Lot 1, that is, title "such as a prudent man, well

advised as to the facts and their legal bearings, would be willing to accept."[12] *Evans*, 144 Or at 23. Rather, in plaintiffs' view, the title they received from LaNoue was unmarketable "because it depended on a ruling of first impression—whether the [OPCA] authorizes a homeowners association to convey property it does not own." Plaintiffs contend that that is "a doubtful and unsettled legal question" that renders title unmarketable and, in support of that view, point to the fact that the MOA subsequently sued plaintiffs, alleging that their title was defective. Plaintiffs rely on *Evans*, 144 Or at 24, in which the Supreme Court explained that "a purchaser does not desire and is not compelled to purchase a lawsuit."

The Supreme Court explained the significance of "doubtful and unsettled" law in *Evans*. The court stated, "The purchaser cannot demand a title absolutely free from all suspicion or possible defect, nor that he be guaranteed against any trouble on account of the title." 144 Or at 22-23. Then it elaborated on the "doubts" that make title unmarketable. It noted that, "if the doubt arises upon a question connected with the general law, the court is to judge whether the law is settled; if not settled * * * the purchaser will be relieved." *Id.* at 23 (internal quotation marks omitted). The reason that title depending on unsettled law is unmarketable is that the decision of the court binds only the parties before it. *Id.* at 24. "But no court can be certain that, upon a doubtful question of law, * * * another court of co-ordinate jurisdiction in which the purchaser's title may be attacked,

---

[12] Plaintiffs' claims against Chicago Title depend on a breach of Chicago Title's obligations arising under the title policy that it issued to plaintiffs. The policy defines "unmarketability of the title" as follows:

"an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A [(Lot 1)] to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title."

Thus, to be unmarketable under the policy, the title must, at least, be unmarketable as a matter of common law. *See, e.g.*, *Evans*, 144 Or at 24 (where title is unmarketable, decree for enforcement of contract to purchase will be denied). Accordingly, our conclusion that plaintiffs received marketable title to Lot 1 under common law also disposes of plaintiffs' claims against Chicago Title under the title policy.

will pronounce the same judgment." *Id.* (internal quotation marks omitted).

Although, as plaintiffs point out, the operation of ORS 94.665(1) is a question of first impression in this case, at the time that plaintiff received title to Lot 1, that question was not "doubtful and unsettled" such that it rendered title to Lot 1 unmarketable. That is so because, as explained above, ORS 94.665(1) unambiguously provides that a homeowners association may convey certain property to which it does not hold title, including the property at issue here. Whereas unannounced principles of common law or applications of law to facts are capable of resolution in different ways in different courts, *see, e.g., Evans*, 144 Or at 24 (question whether will had created contingent remainder or executory devise was unsettled), unambiguous statutory text may be free from doubt despite a lack of appellate precedent interpreting it. That is the case here. Accordingly, the fact that no appellate court had endorsed the plain meaning of ORS 94.665(1) when plaintiffs received title to Lot 1 did not render title unmarketable.

We reach that conclusion notwithstanding the fact that the MOA later challenged plaintiffs' title in court. Although a purchaser is not compelled to purchase a lawsuit, he or she also cannot "be guaranteed against any trouble on account of the title." 144 Or at 22-23. In other words, we consider only the objective likelihood that a potentially meritorious action will be filed, not whether an action in fact was filed. That is so because an action may be filed even if no unsettled question of law casts doubt on the buyer's title. Accordingly, the title to Lot 1 was marketable when plaintiffs received it even though the MOA later challenged it. The trial court did not err in concluding that plaintiffs received marketable title to Lot 1.

C. *The Duty-to-Defend Claim*

We turn to plaintiffs' final assignment of error, namely, that the court erred in concluding that Chicago Title's duty to defend plaintiffs against the MOA's claims never arose because plaintiffs did not timely notify Chicago Title of the claims. Before the trial court, plaintiffs argued

that, even if their notice was untimely, both the policy and Oregon law required Chicago Title to prove that it suffered prejudice as a result of the untimely notice. Chicago Title responded with two arguments: First it argued that plaintiffs had settled with the MOA before notifying Chicago Title of the claims. Based on that proposition, it argued that it had no duty to defend plaintiffs from the MOA claims because the duty to defend does not arise until the notice occurs. That is, in Chicago Title's view, an insurer's duty to defend never arises if it does not learn of the claims until they have been settled. Second, Chicago Title contended that it was prejudiced by plaintiffs' defense and settlement of the claim before plaintiffs notified Chicago Title. The trial court accepted Chicago Title's first argument and ruled that plaintiffs had settled with the MOA before notifying Chicago Title of the claims. Accordingly, it concluded that Chicago Title never had a duty to defend plaintiffs. For the same reason—plaintiffs settled the claims before notifying Chicago Title of their existence—it concluded that Chicago Title was prejudiced by plaintiffs' late tender.

Both of those conclusions were erroneous because the record on summary judgment did not show that plaintiffs settled with the MOA before tendering the claims to Chicago Title. As explained above, plaintiffs learned that the MOA was disputing their ownership of Lot 1 in June 2006 and the MOA filed claims against plaintiffs in September 2006. The record reflects the following additional facts regarding the settlement of the MOA claims: On January 8, 2007, after plaintiffs and the MOA had engaged in settlement negotiations, counsel for the MOA e-mailed proposed settlement documents to plaintiffs' counsel. In his e-mail, he stated, "Please let me know if we have a structure around which to file a dismissal without prejudice as to your client."

On January 16, counsel for plaintiffs responded by e-mail as follows:

"I have now had a chance to discuss with my client the agreement outlined in your letter and attachments of January 8, 2007, as elaborated upon during the phone conversation I had with you on January 11. [Plaintiffs] agree[]

in principle to the resolution of outstanding claims as out-lined in your letter.

"To clarify and confirm certain points:

"[Counsel set out eight additional and more specific terms under which plaintiffs would agree to the settlement.]

"Let me know if it looks like we are in agreement."

Between January 22 and 25, Chicago Title received plaintiffs' notice of the MOA's claims. On March 1, plaintiffs' principal signed the settlement agreement. On March 26, the court in the MOA action signed a judgment dismissing the MOA's quiet-title claim against plaintiffs.

Whether a settlement contract exists is a question of law. *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 132, 146 P3d 399 (2006), *rev den*, 342 Or 416 (2007). To form a contract, the parties must "agree[] to the same express terms of the contract." *Baldwin and Baldwin*, 215 Or App 203, 207, 168 P3d 1233 (2007). Here, the trial court's conclusion that plaintiffs settled the MOA claims before tendering them to Chicago Title rested on the view that, on January 16, when plaintiffs' counsel said that plaintiffs "agree[d] in principle" to the settlement terms proposed by counsel for the MOA, the parties had agreed to the terms of a contract and, accordingly, had settled the case. However, the rest of counsel's e-mail belies that understanding. Counsel offered additional and more specific terms, and he closed with the statement, "Let me know if it looks like we are in agreement." Thus, on January 16, the parties had not yet agreed on settlement terms. The only other evidence in the record of the parties' agreement is that plaintiffs' principal signed the settlement agreement on behalf of plaintiffs on March 1, after Chicago Title had been notified of the MOA's claims.

The cases that Chicago Title cites in defense of the court's reasoning are inapplicable. *See Lemley v. Lemley*, 221 Or App 172, 177-78, 188 P3d 468 (2008) (letter from the plaintiff's counsel set out the terms of the agreement and provided that the defendant's counsel could accept terms on behalf of the defendant by signing the letter; the defendant's counsel did so and sent a copy to the defendant; then the plaintiff's counsel signed the letter on behalf of the plaintiff);

*Dalton*, 209 Or App at 133-35 (parties' "agreement in principle" was binding because it was signed by the parties and they intended it to be a binding contract). The trial court erred in granting summary judgment on the duty-to-defend claim on the ground that plaintiffs settled the claim before they tendered defense of it to Chicago Title.

## V. CONCLUSION

To summarize, the title that plaintiffs received to Lot 1 was not defective and was marketable, and the trial court did not err in granting summary judgment on all claims other than the duty-to-defend claim. However, there is a genuine issue of material fact as to whether plaintiffs settled the MOA claims before tendering their defense to Chicago Title; accordingly, the trial court erred in granting summary judgment for Chicago Title on plaintiffs' duty-to-defend claim.

Reversed and remanded on duty-to-defend claim against Chicago Title; otherwise affirmed.